## CITY OF ST. PETERSBURG v. ATLANTIC COAST LINE RY.

Railroad & Public Utilities Commission.

June 30, 1955.

Erle B. Askew, S. E. Simmons and Carroll R. Runyon, all of St. Petersburg, for petitioner.

Baya M. Harrison, Jr., St. Petersburg, and Charles Cook Howell, Jacksonville, for respondent.

Chairman WILBUR C. KING and commissioners JERRY W. CARTER and RICHARD A. MACK participated in the hearings and disposition of this case.

BY THE COMMISSION.

This matter came on to be considered by the commission as the result of a formal petition by the city of St. Petersburg for re-

location of the passenger and freight depots of the Atlantic Coast Line Railroad Co. (hereinafter referred to as "the railroad.")

The city's petition filed April 7, 1954 in substance alleged that the railroad's passenger station is old, unsightly, obsolete, poorly arranged and no longer adequate from the standpoint of the convenience and necessities of the traveling public; that it is situated only one block south of Central Avenue—the city's main thoroughfare—and causes serious traffic congestion; that the congested conditions in its vicinity resulting from its location in the heart of the business section and the inadequate parking facilities provided for those having business with the railroad have conspired to make it grossly inaccessible for the traveling public and others having business on the station premises; that the frequent movement of trains to and from the station across heavily traveled streets in the main business section causes serious traffic congestion, prevents the free flow of traffic, subjects the public to undue hazards and constitutes a continuing threat to public safety by impeding the free movement of fire, police and ambulance traffic; that the freight station, also in the heart of the business district, is inadequate in size and accessibility and is a menace to the public's safety and welfare; that the freight station because of its location and arrangement causes serious traffic congestion on heavily traveled streets in its vicinity—and that the passenger and freight depots should be relocated to sites not inimical to the public welfare and safety and in keeping with the public convenience and necessity.

Under its rules of practice the commission served a copy of the petition on the respondent, directed it to satisfy the complaint or plead thereto within 15 days from the receipt of such notice.

Before respondent filed a response to the petition the city filed a petition for leave to take depositions by written and oral interrogatories. The city sought authority to take the depositions of railroad officials before a notary public in Wilmington, N. C., where the railroad's home office is located. The petition stated that depositions would be taken for the purpose of eliciting information material to the issues in this proceeding. Ninety-seven written interrogatories were proposed therein, and in addition an authority was sought to propound oral interrogatories.

After the foregoing pleadings had been filed respondent filed a motion to strike an allegation in paragraph 11 of the original petition, also filed its answer thereto. The city then filed a motion for a more definite statement relating to allegations in respondent's answer as to the commission's jurisdiction, also filed a motion to strike portions of the answer.

The commission served notice on the railroad of the petition for leave to take depositions, directed it to show cause on June 1, 1954 at the commission offices in Tallahassee why we should not enter an order authorizing such depositions. Notice was also served on the parties of a hearing to be held on June 1 in Tallahassee on the motions of both parties to strike and the city's motion for a more definite statement.

The railroad thereafter filed a motion to quash the commission's notice and order on the petition for leave to take depositions and the commission notified the parties that such motion would also be heard on June 1. The railroad then filed a motion for continuance of the June 1 hearing and we notified the parties that on June 1 we would hear oral argument on the motion for continuance and all other pending motions then filed or which might be filed prior to that date. Subsequent to this notice the railroad filed a motion to quash and objections to the petition for leave to take depositions.

After due consideration of the pending pleadings the commission denied the city's motion for a more definite statement, its motion to strike portions of respondent's answer, and the railroad's motion to strike portions of the city's original petition. At the same time the commission designated one of its members to hold a pre-hearing conference in St. Petersburg for the purpose of determining which of the proposed interrogatories should be answered by respondent— directing the commissioner to hold a hearing thereafter in Wilmington, N. C., for the purpose of receiving the railroad's answers to those interrogatories which might be approved by the commission.

On July 8, 1954 the designated commissioner held the pre-hearing conference as directed for the purpose of determining which of the city's interrogatories should be answered. At that conference the respondent objected to answering *any* of the interrogatories. Thereupon the petitioner discussed the individual questions by groups. The first group of questions related to the adequacy of the present stations. The second group related to the present cost of the railroad's operations as compared to such cost in the event the stations are relocated. The third group pertained to the location of the present stations as they affect traffic, and their effect on the growth of the city's business district. The last group related to the convenience of the public. After the petitioner advanced various reasons why the railroad should be required to answer the individual questions in each category, respondent raised specific objections to each individual question in each classification. The parties supported their positions by the expert testimony of well-qualified engineers.

After hearing argument concerning the various interrogatories and being fully advised of the vast scope of the various questions involved, the designated commissioner concluded that the interrogatories were premature at that time and that the city should first be required to submit evidence at a public hearing in support of its petition.

The full commission concurred in the findings and opinion of the designated commissioner, entered an order setting the matter down for a public hearing in St. Petersburg on October 5, 1954. When the hearing convened we announced that two primary questions were involved—(1) Should the railroad's passenger and freight stations be relocated and replaced at new locations by new, modern and adequate facilities capable of fully meeting the public convenience and necessity, and (2) where such new facilities should be located. The October hearing was limited to the first question. At that time we announced that a determination of the second question would be the subject of further hearings—if we should enter an affirmative order concerning the first question.

Voluminous testimony and exhibits were received at the October hearing from petitioner. A subsequent hearing was held in December 1954 at which time respondent presented testimony and exhibits in opposition to the petition. A third hearing was held in March 1955 for the purpose of receiving rebuttal evidence from petitioner. At the conclusion of that hearing we requested the parties to file briefs, together with proposed findings of fact and conclusions of law—and announced that we would subsequently set a date for oral argument on the various issues involved.

Before briefs were filed and oral arguments heard respondent filed a motion to dismiss the proceeding on the ground that it had been rendered moot by the city's action in adopting an ordinance requiring it to elevate its tracks from 16th Street North to Bayshore Drive. After the city answered respondent's motion we advised the parties that oral argument would be heard on the motion on June 8, 1955, at which time oral arguments on the merits of the city's original petition would likewise be heard. Briefs were filed on June 6, oral arguments were heard by the full commission on June 8 as scheduled.

After a careful study and consideration of the entire record herein, and based thereon, the commission makes the following findings of fact—

1. In 1887 or 1888 Orange Belt Company constructed a railroad from Sanford, Fla. to St. Petersburg and built a depot on the present site of the passenger station—at which time St. Petersburg was a village of

about 30 inhabitants. The village grew into a town of 7,186 inhabitants by 1915—when the present passenger depot was built.

2. The railroad tracks enter the city at 40th Avenue North at approximately 35th Street and run in a southeasterly direction, crossing Central Avenue between 13th and 14th Streets, proceed one block, then turn eastward and continue to Tampa Bay. From the point where they intersect the city limit to the bay they cross practically all the heavily traveled city streets at grade. After crossing 13th Avenue North to the end of the line they traverse the city's main business district. From 7th Street eastward to 3rd Street they are in the center of First Avenue South—creating a divided street for the passage of motor vehicles. From 7th Street westward to Central Avenue and from 3rd Street eastward to the bay they occupy the entire street—which is not open to vehicular traffic.

3. Central Avenue is the main arterial highway running from Tampa Bay on the east to Boca Ciega Bay on the west. The railroad depot is situated almost a block south of Central Avenue between 2nd and 3rd streets, both of which are heavily traveled streets. The tracks are on the south side of the depot. Both 2nd and 3rd streets are paved a width of 60 feet. First Alley South is also paved. There is an open space between the south margin of First Alley South and the north wall of the depot with the exception of a masonry island on the west end of this area used for the discharge of passengers from taxicabs and a grassed lawn surrounded by masonry work on the east end. The entrance to the white waiting room is on the north side of the depot and from the south side of First Alley South to the entrance to the white waiting room is 71 feet, 8 inches. First Alley South is 20 feet wide. The block between First Alley South and Central Avenue is designated as block 32 and is built solid with stores from 2nd to 3rd Streets, the rear end of which abut on First Alley South. The service entrances of these stores are on First Alley South which is used by commercial vehicles practically all the time. On the 3rd Street side of the station building spaces are provided for the parking of vehicles along the island. At the west end of the area spaces are marked for the use of taxicabs. Along the north side of the building 17 spaces are provided for the parking of automobiles for the convenience of the public who have business to transact at the station. On the 2nd Street side are 5 or 6 spaces provided for parking automobiles which are used in the main by the Railway Express Co. for trucks. North of the grassed lawn surrounded by masonry work at the east end of the building is situated the office and warehouse of the Railway Express Co. From the north border of this grassed lawn to the south wall of the railway company is a distance of 40 feet. Between the grassed lawn and the depot is a driveway 26 feet wide—which is usually blocked by the trucks of the express company. The express company also has a service station at the east end of the depot. West of this service station is the white waiting room. Immediately west of the white waiting room is the ticket office and station agent's office. West of the ticket office is the colored waiting room. West of the colored waiting room is a covered patio. Immediately west of the patio is the baggage room and parcel check office. There is a covered walk on the south side of the depot which extends almost the entire distance from 2nd Street to 3rd Street. Under this shelter, in front of the south door to the white

waiting room, is a sign directing passengers to board trains east of 2nd Street. The building was erected in 1915. It is far from modern but is large enough in the main to accommodate the normal requirements of the traveling public and others having business at the station, although the waiting rooms are small without sufficient seating capacity for the convenience of the passengers and those who go to the depot to see them aboard and those who go there to meet passengers on incoming trains. The toilet facilities are insufficient and unsanitary.

The baggage room in the station is poorly located and difficult of access. It can be reached by car, truck or taxicab only through an alley 26 feet wide which runs eastward from 3rd Street. Automobiles are usually parked adjacent to this narrow passage which makes an entrance to the baggage room by automobiles difficult.

4. To reach the door of the white waiting room by motor car it is necessary to enter the areaway between First Alley South and the depot building either from 2nd Street or 3rd Street and this areaway is invariably congested with motor vehicles, particularly during the arrival and departure of trains. Seldom, if ever, is there one of the parking spaces, provided for the public, vacant for the use of passengers and those who go to the depot to transact business. It is almost impossible to find a vacant parking space within two or three blocks of the passenger depot and large numbers of people who go to the depot to board trains are compelled to doublepark in either 2nd or 3rd Street because of the congested condition of First Alley South and the small areaway north of the station, unload their baggage and take their motor vehicle two or three blocks to park the same.

5. The railroad yards are situated north of 13th Avenue North and west of 19th Street. All trains are made up for departure in the yards and are backed from the yards to the station across the most heavily traveled streets of the city and through the business district. During the winter months a train called the Havana Special arrives in St. Petersburg about 7:50 A.M., unloads at the depot and backs out to the yards. About 9:00 A.M. a train designated as the Champion, consisting of 16 to 18 units, backs from the yards to the depot to be loaded for departure at about 10:30 A.M. This train invariably is placed on the first track south of the depot, that is next to the station. While this train is waiting for departure time invariably another train of 8 to 10 units, called the Southland, arrives on the track next to the train made up for departure, leaving a very narrow space between the two trains for the passengers to detrain and for the unloading of baggage. There is no platform for the convenience of passengers getting off between these two trains but merely an asphalt like substance on the ground. Nor is there any canopy or shelter provided for the convenience of passengers in inclement weather. Passengers alighting from the Southland cannot go directly to the depot, but are compelled to go either west to 3rd Street and around the locomotive, or east to 2nd Street and around the broken end of the train waiting for departure, in order to reach the depot. Not infrequently the passengers are compelled to debouch into the street subjecting them to injury from traveling vehicles.

Passengers leaving on outgoing trains, in obedience to the sign directing them to go east of 2nd Street, cross 2nd Street and proceed

toward 1st Street and sometimes cross 1st Street and go almost to Shore Drive, depending upon the particular pullman car to which the passenger is assigned. East of 2nd Street there is no platform provided for the convenience of passengers but only a narrow asphalt like pavement laid flush with the ground which extends only part of the way. There is no shelter or canopy of any kind east of 2nd Street for the protection of the passengers in inclement weather.

After the Southland arrives and the passengers detrain, the Champion departs, traversing the business district and crossing the most heavily traveled streets in the city, bypassing the railroad yards on its way to Jacksonville and points north. When the Southland unloads its baggage, mail and express cars, it backs out to the yards over the same route. About 3:30 in the afternoon the Havana Special backs from the yards over the same route for loading for departure at 7:30 P.M. and soon thereafter the Southland also backs from the yards to the station to be loaded for departure at 6:00 P.M. While the Southland is standing at the station, waiting for the time of departure, invariably the West Coast Champion arrives compelling the passengers to detrain between the Southland and the Champion. After the Champion unloads its mail, baggage, and express cars it backs to the yards and then the Southland departs at approximately 6:00 P.M. After 7:00 P.M. the Havana Special leaves over the same route.

6. All these trains, whether backing to the station for departure or arriving, block 3rd Street, 2nd Street, 1st Street and most of the time Shore Drive. Incoming trains usually clear 3rd Street, which they block only long enough for the passage of the train, but by that time the locomotive is down between 1st and 2nd Streets, or between 1st Street and Shore Drive, depending upon the length of the train. In the winter season, trains with 15 or 16 cars entirely block 2nd Street and 1st Street until the passengers are unloaded from the cars, which takes generally from 6 to 10 minutes. During that time the train crew detaches the mail and express cars, pulls them down across 1st Street and back into the stub end track which is on the north side of the main tracks between 1st and 2nd Streets. This switching movement also blocks 1st Street for a period of time. The engine then goes back and attaches to the remaining cars parked east of 1st Street, and then returns and connects up with the cars still standing in front of the station. Usually there is a dining car which occupies the second from the end position in the train near 3rd Street. The entire train is then pulled back down eastward blocking 1st Street again. The dining car is brought back westward and attached to the Southland which is ready for departure. Then the whole train is pulled down again blocking 2nd Street for 6 or 7 minutes and then carried to the yard. The operation requires 45 to 60 minutes or longer, during which time one or more of the streets mentioned are blocked by train movements. Located as the station is it is impossible to switch the incoming or outgoing trains without blocking either Shore Drive, 1st, 2nd, or 3rd Streets. In effect the whole area of St. Petersburg from 3rd Street eastward is used by the railroad as a train switching yard. On occasion, cars are left blocking the streets for as long as 96 minutes. The blocking occurs because it is

impossible to clear the engine on 3rd Street and leave 2nd Street unblocked and sometimes 1st Street. Because 1st Avenue South is not open east of 3rd Street and 2nd and 3rd Streets are blocked by the movement of the trains the vehicular traffic cuts through First Alley South and the depot, thereby causing terrific traffic congestion in both the alley and in front of the depot—thus making the depot inaccessible to those desiring to go there to transact business with the railroad, and those who go there to depart on trains or to meet arriving passengers.

This blocking of the streets by the switching movements of the trains interferes greatly with the flow of vehicular traffic during the busy time of each day.

7. At the time the depot was built in 1915 the city had a population of only 7,186 and there were few automobiles in use. St. Petersburg has grown rapidly and now has a population of approximately 125,000. The increased use of motor vehicles by the local population and visitors from other states has created a serious traffic problem in the vicinity of the depot and all streets crossed by the rails.

In 1915 the total number of winter visitors approximated 23,000—in 1954 there were approximately 534,000 winter visitors. In 1915 approximately 17,000 came by train—in 1954 approximately 84,000.

8. The city's main fire station is located on 3rd Street South one block south of the depot, and it is a frequent occurrence that fire alarms are turned in when trains block 3rd Street, 2nd Street, 1st Street and Shore Drive—compelling the fire equipment to detour in order to answer the alarm. It frequently happens that the blocking of these streets backs the traffic up beyond Central Avenue to the north and 2nd Avenue to the south and across the intersections thus blocking the east and west flow of traffic on Central Avenue at the intersection.

9. The station located as it is, under the conditions which exist, is insufficient to meet the requirements of the traveling public and does not provide the necessities or convenience which the traveling public requires.

10. In 1904 the city vacated that portion of 8th Street South extending from the south margin of First Alley South to the railroad tracks, conveying that area to the railroad for freight depot purposes. The railroad built a freight depot on First Alley South and across the vacated portion of 8th Street just one-half block south of Central Avenue. At that time the city had a population under 2,500. As the result of the construction of the depot 8th Street South comes to a dead end at the south margin of First Alley South—there is no access to the freight station from the south. It can be reached only by driving off Central Avenue down 8th Street South or by traversing an alley one-half block south of and parallel to Central Avenue. The entrance to the alley is from 7th Street. It is narrow and has commercial cars and trucks parked along the same. Seventh Street and Central Avenue are both heavily traveled and it is difficult to turn into the alley to gain access to the freight station. Exit from the alley is possible only by making a complete U turn at the

station and proceeding north on 8th Street to Central Avenue, or by going westward down the alley into 9th Street. Traffic on both Central Avenue and 9th Street is so heavy that it is difficult and often dangerous to leave the alley and merge with the traffic on either street.

The switches connecting the main line to the tracks serving this station are on 7th Street South on the east end, and 9th Street South on the west end—so that every train movement has to block either 9th or 7th Street with the possible exception of an engine pulling one car.

As a result of its inaccessibility and the switching movements of the freight trains, the freight depot cannot and does not provide the convenience and necessity required by a city of 125,000 people. The city is still growing rapidly and the condition which exists now will grow tremendously worse as the city continues to grow.

11. An average of 147,845 motor vehicles cross the tracks from and including 13th Avenue North southeastward and eastward to the bay daily. There is an average of 387 daily train movements over these same crossings, causing 4,470 motor vehicles to be delayed at the crossings daily. The total time occupied by trains at these crossings daily is 7 hours and 44 minutes—and each crossing, on the average, is occupied by trains 27 minutes and 18 seconds daily. The traffic signals are so regulated as to provide the maximum continuous flow of traffic—when the crossings are blocked by trains the flow is halted causing it to back up several blocks, blocking the traffic on the cross streets.

12. The locations of the passenger and freight depots and the tracks serving the same greatly retard the expansion of the business district and vitally and adversely depreciate the value of property in the proximity thereof.

Based on the record herein, and the laws of Florida applicable thereto, the commission has arrived at and announces the following conclusions of law—

The passenger depot is grossly inadequate and incapable of providing the public convenience and necessity required by the traveling public.

The freight depot is grossly inadequate and fails to provide the public convenience and necessity required by those who ship and receive freight through it.

Both the passenger and freight depots should be relocated so as better to serve the inhabitants of the city of St. Petersburg.

Respondent's motion to dismiss based on the city ordinance requiring elevation of the railroad's tracks should be denied.

It is ordered that the respondent railroad be and it is hereby directed to remove its St. Petersburg passenger and freight stations

from their present locations, and to construct and operate new, modern and adequate passenger and freight stations, capable of fully meeting the convenience and necessities of the public, at such location or locations in the city consistent with the public interest, safety and welfare, as may be determined and directed by this commission pursuant to a further hearing to be held at a time and place subsequently to be announced by the commission.